UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

OAK FINANCIAL GROUP, INC.,

                                             Case No.: 1:21-cv-03249-FB-MMH

                Plaintiff,

          - v -

INFINITY Q DIVERSIFIED ALPHA FUND, TRUST
FOR ADVISED PORTFOLIOS, INFINITY Q            **AMENDED COMPLAINT**
CAPITAL MANAGEMENT LLC, CHRISTOPHER
E. KASHMERICK, JOHN C. CHRYSTAL, ALBERT
J. DIULIO, S.J., HARRY E. RESIS, RUSSEL B.
SIMON, STEVEN J. JENSON, JAMES VELISSARIS,
LEONARD POTTER, SCOTT LINDELL, QASAR
DISTRIBUTORS, LLC, EISNERAMPER LLP,
BONDERMAN FAMILY LIMITED PARTNERSHIP,
LP, INFINITY Q MANAGEMENT EQUITY, LLC
and U.S. BANCORP FUND SERVICES, LLC.

                Defendants.
-------------------------------------------------------------------x

      Plaintiff Oak Financial Group, Inc., by its attorneys, Rosenfeld & Kaplan, LLP, for its

Complaint against defendants Infinity Q Diversified Alpha Fund, Trust for Advised Portfolios,

Infinity Q Capital Management LLC, Christopher E. Kashmerick, John C. Chrystal, Albert J.

DiUlio, S.J., Harry E. Resis, Russel B. Simon, Steven J. Jenson, James Velissaris, Leonard

Potter, Scott Lindell, Quasar Distributors, LLC, EisnerAmper LLP, Bonderman Family Limited

Partnership, LP, Infinity Q Management Equity, LLC and U.S. Bancorp Fund Services, LLC.,

alleges as follows:

## **NATURE OF THE ACTION**

      1.     This is a federal securities action brought by Plaintiff Oak Financial Group, Inc.

("Plaintiff" or "Oak Financial"), an investment adviser which, on behalf of its clients (the

"Account Holders"), purchased the Infinity Q Diversified Alpha Fund Institutional Class shares

(IQDNX) (the "Diversified Fund") between October 27, 2015 and August, 2020.  Plaintiff seeks to recover compensable damages caused by the defendants' violations of the federal securities laws, as well as under the common law of the State of New York.

2.     This case arises from the collapse of the Diversified Fund that suffered massive losses following a forced liquidation by the SEC due to, *inter alia*, defendants': (a) manipulation of the pricing methodology for the Funds' assets; (b) failure to employ the valuation methodologies and internal controls, polices, and procedures represented to investors; and (c) material overstatement of the Funds' net asset value ("NAV").[1]  The Diversified Fund and other Infinity Q Funds were marketed to investors seeking moderate growth and asymmetric returns through a "swap" strategy that would purportedly preserve capital and avoid the massive risks of aggressive hedge funds seeking greater returns.  Swaps are bilateral contracts, brokered by banks, that traders use to bet on asset prices, interest rates, or other financial trends.

3.     Infinity Q attracted billions of dollars of investments and boasted of its close connection between Infinity Q and its Chief Investment Officer ("CIO") Velissaris, and the private equity billionaire David Bonderman, the founding partner of private-equity giant TPG.

4.     A now-archived version of Infinity Q's website states that Infinity Q was "managed by David Bonderman's family office."

5.     The Infinity Q website highlighted its connection with Bonderman:

> ***Infinity Q Capital Management is a pioneering investment advisor managed by David Bonderman's family office.***  The investment team at Infinity Q develops next generation forecasting models to identify persistent behavioral biases across global markets.  Infinity Q uses volatility strategies to manage mutual funds, hedge funds and separately managed accounts.

---

[1] NAV equals the total value of the cash and securities in a fund, less any liabilities..

6.      Wildcat Capital Management and Infinity Q were managed by overlapping personnel, employing similar investment strategies, and being run out of the same offices.  The Diversified Fund's Annual Reports to Shareholders touted the Diversified Fund's close association with Wildcat Capital Management, affiliation with Bonderman, and ability to provide exposure to alternative strategies used by hedge fund and private equity investors like Bonderman.

7.      The "alternative strategies" referred, in large part, to investments in total return swaps.  Total return swaps are contracts by which parties agree to exchange sums equal to the income streams produced by specified assets (hereinafter, "swap contracts").

8.      Because the value of swap contracts can depend on a variety of factors, they have the potential to offer returns that do not move in synch with overall stock and bond markets. Swap contracts can also be difficult to value.  For this reason, Infinity Q purportedly relied on models provided by third-party pricing services to determine the value of certain of the Funds' swap contracts for the purpose of calculating the daily NAV.  Indeed, all of the Funds' swap contracts were categorized  as Levels 2 and 3 on the Financial Accounting Standards Board ("FASB") pricing hierarchy, meaning that their valuations carried the highest amounts of risk and uncertainty.

9.      Although the offering materials for the Diversified Fund and other Infinity Q Funds provided boilerplate risk disclosures, including potential risks associated with "Models and Data," "Manger Risk," "valuation" risk, and "Misconduct of Infinity Q Personnel Third-Party Service Providers," the materials failed to disclose *any* known risk that the valuations could be based, in part, on third-party valuation models that had been ***intentionally*** manipulated by Infinity Q. Using these manipulated valuations, defendants successfully caused Infinity Q to

show hundreds of millions of dollars in exaggerated gains, creating a false record of success that Infinity Q in turn used to charge inflated fees, induce existing pool participants to commit additional monies, and lure in new participants.

10.     Instead of disclosing the infirmities with their valuation protocols, the marketing materials instead boasted of the purportedly robust valuation, procedures, methodologies, and controls employed by each of the Funds to ensure accurate NAV pricing that reflected the true value of the Funds' assets and that were subject to vigorous oversight and cross checks to ensure pricing integrity.  Similarly, the offering materials omitted and failed to disclose the material risk that investors faced catastrophic losses of their capital investment due to improper valuations of the Funds' large swap and derivatives portfolio.

11.     During the period relevant to this Complaint (the "Relevant Period"), Infinity Q's personnel engaged in systematic remarking of the of the Diversified Fund's and other Infinity Q Funds' assets in order to make the NAV of those funds appear artificially higher.  The Infinity Q Funds have subsequently admitted that a significant portion of the portfolios were deliberately mismarked for an extended period.

12.     In May 2020, the SEC's Division of Enforcement launched an inquiry into Infinity Q's securities valuation practices.  By November 2020, the SEC's investigation had expanded to include U.S. Bancorp.  Because of the ongoing valuation issues, Infinity Q announced at the end of December 2020 that it would no longer accept new investments, but concealed the basis for that decision and the ongoing problems.

13.     In February 2021, the SEC informed Infinity Q that the Funds should enter liquidation proceedings immediately given the extent of the valuation issues.

14.     On or around February 22, 2021, Infinity Q halted redemptions to investors, saying it could no longer value its holdings after at least two whistleblowers raised concerns about the Funds to the SEC. The SEC informed Infinity Q of evidence that the firm's CIO, defendant Velissaris, had manipulated parameters of third-party pricing models used to value its derivatives, leaving Infinity Q unable to accurately value its holdings. Infinity Q also announced that it had barred Velissaris from trading, placed him on administrative leave, and needed to reassess the Funds' previous valuations before returning money to investors.

15.     Infinity Q admitted that "it was unable to verify that the values it had previously determined for the Swaps were reflective of fair value." Infinity Q further admitted that it was unable to verify whether the values for positions other than swaps were reliable, and that it could not calculate an NAV that would enable it to satisfy requests for redemptions of the Funds' shares.

16.     Infinity Q thereafter requested that the SEC halt redemptions from the Diversified Fund. The SEC thereupon indefinitely halted redemptions in the Diversified Fund's shares the same day as requested, effective as of February 19, 2021.

17.     On March 11, 2021, the Diversified Fund's website provided an update on the liquidation effort announced in February. The Diversified Fund stated that, as of two days earlier, the Diversified Fund held a total of approximately $1.2 billion in cash or cash equivalents, which was over $500 million less than the NAV that the Diversified Fund had calculated just a few weeks before. According to a derivative complaint filed in Delaware Chancery Court, Infinity Q attributed the Diversified Fund's "losses almost entirely to the 'value realized on liquidation of the Fund's [swap instruments] compared to their [last] stated value.' In

other words, the principal securities [defendants] had been tasked with valuing were, in reality, worth pennies on the dollar."

18.     On June 7, 2021, the Diversified Funds submitted a Plan of Distribution (the "Plan") to the SEC.[2]  The Plan, which was finalized on November 8, 2021, called for an interim distribution of $500 million to shareholders on a *pro rata* basis.  The Plan also established a Special Reserve, holding back $750 million until the Diversified Fund's liabilities were resolved.[3]

19.     On February 17, 2022, defendant Velissaris was indicted by the United States Department of Justice ("DOJ") for securities fraud and obstruction of justice for orchestrating a scheme to deceive the Funds' investors and falsify documents. On the same day, both the SEC and the Commodity Futures Trading Commission ("CFTC") civilly charged Velissaris with, inter alia, fraud for overvaluing the Funds' assets by more than $1 billion while pocketing tens of millions of dollars in fees. The SEC's complaint alleged that, from at least 2017 through February 2021, Velissaris engaged in a fraudulent scheme to overvalue assets held by both the Diversified Fund and the Volatility Fund. According to the complaint, Velissaris executed the overvaluation scheme by altering inputs and manipulating the code of a third-party pricing service used to value the Funds' assets. Moreover, Velissaris falsely showed gains on hundreds of swaps held by two commodity pools managed by Infinity Q, a CFTC-registered commodity pool operator. The SEC also alleged that, by masking actual performance, Velissaris sought to thwart redemptions by investors who likely would have requested a return of their money had they known the Funds' actual performance, particularly in the volatile markets in the wake of the

---

[2] *See* https://www.infinityqfundliquidation.com/documents.
[3] According to the most recent shareholder update, as of July 31, 2022, the Diversified Fund's total assets were $579,490,181.  The amount remaining in the Special Reserve was $568,265,116. *See* https://www.infinityqfundliquidation.com/operatingreport.

COVID-19 pandemic. The SEC complaint further alleged that at times during the pandemic, the Funds' actual values were half of what investors were told.

20.     As a result of these egregious acts, the Diversified Funds' investors, including the Plaintiff and each of its customers, have been unable to withdraw their money from the Funds.

### JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to §§ 10-b and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder, and §§ 11, 12(a), and 15 of the Securities Act of 1933, as amended (the "Securities Act"), and the common law of the State of New York.

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, and pursuant to § 22 of the Securities Act and § 27 of the Exchange Act.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) as the alleged misstatements occurred and subsequent damages took place within this judicial district, and pursuant to § 22 of the Securities Act and § 27 of the Exchange Act.

24.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### PARTIES

25.     Plaintiff Oak Financial, a Connecticut corporation, is a SEC registered investment adviser that, among other things, provides investment management services to its clients.  Oak Financial brings this lawsuit to recover damages sustained by a group of its clients holding 257

accounts (the "Account Holders"), on whose behalf Oak Financial invested in Infinity Q Diversified Alpha Fund.

26.     Oak Financial entered into an advisory agreement with each of the Account Holders, pursuant to which they granted Oak Financial authority to manage their funds through Charles Schwab accounts in the Account Holders' names, and to invest those funds and make trades at their full discretion.

27.     Each of the Account Holders has assigned to Oak Financial their right, title and interest in any claim of any nature whatsoever related to or arising out of their purchase of any shares or ownership of any interest in the Infinity Q Diversified Alpha Fund, as well as any and all rights to initiate, pursue, prosecute, collect, settle, and compromise any suits, actions, proceedings, and/or claims of any nature whatsoever arising out of or in connection with their investment in Infinity Q Diversified Alpha Fund.

28.     Defendant Infinity Q Diversified Alpha Fund (the "Diversified Fund") is a diversified open-end investment company.  It transacts business in New York.

29.     Defendant Trust for Advised Portfolios (the "Trust"), the Diversified Fund's registrant, is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 (the "ICA") as an open-end management investment company.  The Trust has 18 series of shares, including as the issuer of the Diversified Fund and the technical filer of the Prospectuses.  The Trust actively controlled the day-to-day operations of the Diversified Fund. The Trust is run by a Board of Trustees (the "Board").  The members of the Board were the officers of the Trust, many of whom signed the Prospectuses and all of whom exercised control over the Diversified Fund and the Diversified Fund's marketing efforts.  The Trust transacts business in New York.

30.     Defendant Infinity Q Capital Management LLC ("Infinity Q" or the "Adviser"), is the investment adviser to the Diversified Fund.  Infinity Q is registered as an investment adviser under the Investment Advisers Act of 1940.  Infinity Q was retained by the Diversified Fund under an investment advisory agreement to act as the it's Adviser, with the authority to make all investment decisions for the Funds, in exchange for a monthly management fee.  Infinity Q was also responsible for the day-to-day management of the Diversified Fund and other Infinity Q Funds in accordance with their investment objective and policies.  In addition to providing advisory services, Infinity Q also provided advisory services to clients of Wildcat Capital Management, and, at all relevant times, officers of Infinity Q were also officers of Wildcat Capital Management. Infinity Q is a Delaware limited liability company with its principal place of business at 888 7th Ave, Suite 3700, New York, NY 10106.

31.     Defendant Christopher E. Kashmerick ("Kashmerick") is and was, at all relevant times, the Chairman of the Board of the Trust, as well as the Trust's President and Principal Executive Officer.  Kashmerick signed the Prospectuses.  Kashmerick transacts business in New York.

32.     Defendant John C. Chrystal ("Chrystal") is and was, at all relevant times, a Trustee of the Board.  Chrystal signed the Prospectuses.  Chrystal transacts business in New York.

33.     Defendant Albert J. DiUlio, S.J. ("DiUlio") is and was, at all relevant times, a Trustee of the Board.  DiUlio signed the Prospectuses.  DiUlio transacts business in New York.

34.     Defendant Harry E. Resis ("Resis") is and was, at all relevant times, a Trustee of the Board.  Resis signed the Prospectuses.  Resis resides in and/or transacts business in New York.

35.     Defendant Russel B. Simon ("Simon") is and was, at all relevant times, Treasurer and Principal Financial Officer of the Trust.  Simon signed the Prospectuses.  Simon transacts business in New York.

36.     Defendant Steven J. Jenson ("Jenson") is and was, at all relevant times, Vice President and Chief Compliance and AML Officer of the Trust.  Jenson transacts business in New York.

37.     Defendant James Velissaris ("Velissaris") is and was, at all relevant times, a Director of the Adviser, and until February, 20, 2021, was its Chief Investment Officer ("CIO"). Velissaris resides in and/or transacts business in New York.

38.     Defendant Leonard Potter ("Potter") is and was, at all relevant times, the Chief Executive Officer of the Adviser.  Potter resides in and/or transacts business in New York.

39.     Defendant Scott Lindell ("Lindell") is the Chief Risk Officer of Infinity Q. Lindell was also the former Head of Risk Management for Wildcat Capital Management. Lindell resides in and/or transacts business in New York.

40.     Defendants Kashmerick, Chrystal, DiUlio, Resis, Simon, Jenson, Velissaris Potter, and Lindell shall be collectively referred to as the "Individual Defendants."  As Trustees, directors and/or executive officers of the Trust and/or Adviser, the Individual Defendants participated in the solicitation and sale of Fund shares to investors in the Fund for their own benefit and the benefit of Infinity Q.

41.     Defendant Quasar Distributors, LLC ("Quasar" or "Underwriter"), is and was, at all relevant times, the principal underwriter for the Diversified Fund. Quasar is a registered broker-dealer and a member of the Financial Industry Regulatory Authority.  Quasar executed an agreement with the Trust for the sale of Diversified Fund shares to the public, and received fees,

commissions and/or profits from these sales.  Quasar's failure to conduct an adequate due

diligence investigation was a substantial factor leading to the harm complained of herein.

Quasar transacts business in New York.

42.     Defendant U.S. Bancorp Fund Services, LLC ("Bancorp" or the "Administrator"),

is and was, at all relevant times, the administrator for the Diversified Fund, the transfer agent,

accountant and custodian for the Diversified Fund, and the parent company of Quasar.  Bancorp

provides single-source solutions to support a variety of investment strategies and products

including mutual funds, alternative investments, and exchange traded funds.  Bancorp received

fees, commissions, and/or profits from the Funds as part of its role as the Administrator for the

Funds.  As Administrator, Bancorp was responsible for the computation of performance data,

including NAV per share and yield.  Indeed, Bancorp consented to be named as the party

"responsible for the calculation of the net asset value" of the Volatility Fund and as the transfer

agent for the Diversified Fund and in offering documents.

43.     According to the derivative complaint:

> Under the Accounting Agreement, U.S. [Bancorp] assumed
> responsibility to, among other things, "[d]etermine the net asset
> value of the Fund according to the accounting policies and
> procedures set forth in the Fund's current prospectus"; "obtain
> prices from a pricing source approved by the [Board] and apply
> those prices to the portfolio positions," including fair valuation for
> "securities where market quotations are not readily available";
> "[c]alcualate per share net asset value, per share net earnings, and
> other per share amounts reflective of Fund operatios"; "[t]ransmit a
> copy of the portfolio valuation to the Fund's investment adviser
> daily"; report to the [Diversified] Fund and NASDAQ the Fund's
> "net asset value for each valuation date"; and "[p]repare monthly
> reports that document the adequacy of accounting detail to support
> month-end ledger balances."

Bancorp further "agreed to 'exercise reasonable care in the performance of its duties'

under the Accounting Agreement and expressly retained liability for its own 'negligence.'"

Bancorp's failure to conduct an adequate due diligence investigation into the NAV of the Diversified Fund and other Infinity Q Funds was a substantial factor leading to the harm complained of herein.

44.     Defendant EisnerAmper LLP ("EisnerAmper" or the "Auditor") is and was, at all relevant times, the Diversified Fund's auditor.  EisnerAmper audited the Diversified Fund's consolidated statement of assets and liabilities, which was filed annually with the SEC in the Diversified Fund's Annual Report.  In each Annual Report, EisnerAmper represented to investors that the financial statements were "present[ed] fairly, in all material respects," and "in conformity with accounting principles generally accepted in the United States of America. EisnerAmper transacts business in New York.

45.     Defendant Bonderman Family Limited Partnership, LP ("Bonderman") is a limited liability partnership established for the benefit of David Bonderman's family wealth and investments.  Bonderman owns more than 25% of the Adviser and is and was, at all relevant times, a control person of the Adviser.  Bonderman resides in and/or transacts business in New York.

46.     Defendant Infinity Q Management Equity, LLC ("IQME") owns more than 25% of the Adviser and is and was, at all relevant times, a control person of the Adviser.  IQME resides in and/or transacts business in New York.

## FACTUAL BACKGROUND

**The Diversified Fund**

47.     The Diversified Fund is registered as an investment company under the ICA.  The Fund commenced operations on September 30, 2014 and began offering two share classes, Class A and Class I.  Those offerings are required to be registered under the Securities Act.

48.     As set forth in the filings and marketing materials, the Diversified Fund's stated investment objective was to generate positive absolute returns. In its offering and marketing materials and filings, the Diversified Fund further stated that it is generally intended to provide exposure to strategies often referred to as "alternative" or "absolute return" strategies, and that it implements these strategies by, among other things, investing globally either directly in, or through, swap contracts on a broad range of instruments, including, but not limited to, equities, bonds (including, but not limited to, high-yield or "junk" bonds), currencies, commodities, Master Limited Partnerships, credit derivatives, convertible securities, futures, forwards, and options.

49.     Defendants issued and distributed the following SEC filings, offering materials, and marketing materials, among other documents and materials, in connection with the continuous offering of the Diversified Fund's shares, including to Oak Financial:

a)   Diversified Fund Registration Statements filed with the SEC with effective dates of February 1, 2018, December 31, 2018, and December 31, 2019 (collectively, the "Registration Statements");

b)   Diversified Fund Prospectuses appended to the Registration Statements dated February 1, 2018, December 31, 2018, and December 31, 2019 (collectively, the "Prospectuses");

c)   Diversified Fund Summary Prospectuses dated February 1, 2018,  December 31, 2018, and December 31, 2019 (collectively, the "Summary Prospectuses");

d)   Diversified Fund Statements of Additional Information ("SAIs") and SAI Supplements;

e) Certified Shareholder Reports of Registered Management Investment Companies (Form N-CSR), filed with the SEC at the end of each fiscal year (August 31) by Infinity Q (the "Diversified Annual Reports");

f) Periodic "Investor Insights" providing market commentary;

g) Periodic "Volatility Updates"; and

h) Periodic "Risk Reports".

50.     As the Account Holders' investment adviser, Oak Financial read, analyzed and relied upon the information set forth in these filings and offering and marketing materials in making decisions as to whether and how much to invest in the Fund on behalf of the Account Holders, as well as whether to retain or sell the Account Holders' shares in the Fund.

51.     Mutual funds like the Diversified Fund must value their assets every day to compute the fund's net asset value ("NAV").  NAV represents a fund's per share market value. It is derived by dividing the total value of all the cash and securities in a fund's portfolio, less any liabilities, by the number of shares outstanding.  NAV computation is undertaken at the end of each trading day and is a critical duty and function of a mutual fund.

52.     During the relevant time period, Infinity Q used models provided by third-party pricing services to determine the value of certain of the Fund's swap contracts for purposes of calculating its NAV.

53.     In reliance on the representations set forth in the SEC filings and marketing and offering materials, including representations as to the Fund's NAV, valuations of its assets, manner of future valuation of assets and calculation of the Fund's NAV, and risk and volatility reports, Oak Financial began purchasing millions of dollars' worth of Infinity Q Diversified Alpha Fund Institutional Class shares (IQDNX) on behalf of the Account Holders.

54.     The Account Holders collectively currently hold shares purchased on their behalf by Oak Financial that were reportedly worth approximately $28,888,962.08 as of February 18, 2021, the last day on which the Fund calculated a net asset value; however, as set forth below, the real value is unknown.

55.     On or about February 22, 2021, in a filing with the SEC, the Fund, the Trust, and Infinity Q admitted that Infinity Q's Chief Investment Officer, defendant Velissaris, had been improperly "adjusting certain parameters" within third-party pricing models that affected the valuation of swap contracts owned by the Fund.

56.     As a result of this disclosure, it became clear that valuations of the Fund's assets that had been reported in SEC filings, as well as in the Fund's daily share pricing (NAV) had been inaccurate and unreliable for some time.

57.     It has further become clear that the defendants repeatedly made materially false and misleading statements in SEC filings, offering materials, marketing materials and in communications with Oak Financial regarding: (1) the Fund's present and past NAV; (2) the Fund's valuation procedures; (3) the risks to investors of investing in Fund shares; and (4) the Fund's risk oversight, as detailed below.

58.     Unbeknownst to Oak Financial, and disregarding the significant risks associated with pricing the Funds' swap instruments, defendants (including the Valuation Committee) did not follow the pricing guidelines in the valuation policies described below, did not review the Funds' swap valuations for accuracy, and did not gather and review materials to support Infinity Q's determinations.

59.    Further, as detailed in the government allegations and alleged in the derivative complaint:

> Rather, [defendants] permitted virtually all of the Fund's swap instruments to be unilaterally priced by Infinity Q and its portfolio manager, Velissaris, using Bloomberg's B-Val pricing service ("B-Val")[4] with virtually no oversight or independent verification. The only derivatives not priced by B-Val were so-called "dispersion" instruments, which Infinity Q was likewise permitted to price unilaterally using its own "proprietary modeling."

60.    Moreover, the Valuation Committee did not require Infinity Q to support or explain any particular swap valuation, did not collect valuation worksheets supporting the prices (as was supposed to be part of the standard valuation process), and otherwise failed to independently verify the models and inputs used in B-Val to generate prices.

61.    The effect of this deviation from the Valuation Policies was that Infinity Q – and Velissaris alone – exercised complete control over the B-Val models and the calculations of the Funds' swap prices.  Indeed, as the SEC would find in its investigation, it was Velissaris alone who inputted and generated the B-Val prices with virtually no oversight or contemporaneous record.

62.    As alleged by the SEC, the mismarking over time in the Diversified Fund was material. The mismarking, which is based on a third-party valuation firm's recalculation of the Diversified Fund's month-end NAV, and at times was more than 65% overvalued, is reflected in Table 1 below:

---

[4] B-Val is a digital platform that estimates the prices of derivative instruments using financial 'models' designed to match the structure of the instrument being priced. Because Bloomberg does not have access to the actual terms of a swap contract, the B-Val service relies on the accuracy of the inputs provided by the user to estimate how a particular instrument may trade in the market.

Table 1: Recalculated Mutual Fund NAV

| Month End | IQ Reported Mutual Fund NAV | Recalculated Mutual Fund NAV | Difference | Percent Overvalued |
|-----------|------------------------------|-------------------------------|------------|---------------------|
| 3/31/2017 | $156,433,465 | $150,456,249 | ($5,977,216) | 3.97% |
| 6/30/2017 | $159,886,216 | $150,827,761 | ($9,058,455) | 6.01% |
| 9/30/2017 | $165,306,959 | $159,449,652 | ($5,857,307) | 3.67% |
| 12/31/2017 | $173,098,348 | $170,908,162 | ($2,190,187) | 1.28% |
| 3/31/2018 | $210,240,557 | $206,520,975 | ($3,719,582) | 1.80% |
| 6/30/2018 | $234,320,148 | $225,651,709 | ($8,668,439) | 3.84% |
| 9/30/2018 | $310,450,929 | $304,083,779 | ($6,367,150) | 2.09% |
| 12/31/2018 | $428,724,464 | $400,457,990 | ($28,266,474) | 7.06% |
| 3/31/2019 | $549,812,778 | $517,609,174 | ($32,203,604) | 6.22% |
| 6/30/2019 | $626,243,979 | $575,038,219 | ($51,205,759) | 8.90% |
| 9/30/2019 | $702,332,704 | $636,806,877 | ($65,525,827) | 10.29% |
| 12/31/2019 | $770,265,076 | $678,227,874 | ($92,037,201) | 13.57% |
| 3/31/2020 | $1,051,949,041 | $634,596,397 | ($417,352,644) | 65.77% |
| 6/30/2020 | $1,367,755,693 | $883,049,535 | ($484,706,158) | 54.89% |
| 9/30/2020 | $1,634,510,959 | $1,149,333,710 | ($485,177,249) | 42.21% |
| 12/31/2020 | $1,807,630,993 | $1,399,060,792 | ($408,570,201) | 29.20% |
| 2/18/2021 | $1,727,194,949 | $1,330,371,820 | ($396,823,128) | 29.83% |

63.     Ultimately, the Diversified Fund and other Infinity Q Funds were forced into liquidation. By November 8, 2021, the Diversified Fund completed the liquidation of its assets. Although the last reported NAV of the Diversified Fund was approximately $1.7 billion, the Diversified Fund only held $1.2 billion in cash and comparable assets following liquidation, confirming that the NAV had been overstated by over $500 million.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD

64.     At all relevant times, defendants misstated the Diversified Fund's historical NAVs because the value of a material portion of the Diversified Fund's assets were admittedly manipulated and overstated. These false figures were then incorporated and repeated in the Registration Statements, Prospectuses, Diversified Fund Annual Reports, and other filings and marketing materials. The Prospectuses were signed by defendants Kashmerick, Chrystal, DiUlio Resis, and Simon

65.     The Registration Statements contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

66.     The defendants continuously falsely stated historical NAV values because the value of a material portion of its assets were admittedly intentionally manipulated and overstated. These false figures were then incorporated and repeated in the Registration Statements, Prospectuses, Annual Reports, and other filings and marketing materials.

67.     Each of the Prospectuses also falsely detailed how the Fund calculates its NAV. Specifically, the Prospectuses stated, in pertinent part:

> NAV is calculated by adding the value of all securities and other assets attributable to the Fund (including interest and dividends accrued, but not yet received), then subtracting liabilities attributable to the Fund (including accrued expenses).
>
> Generally, the Fund's investments are valued at market value or, in the absence of a market value, at fair value as determined in good faith by the Fund's Adviser with oversight by the Trust's Valuation Committee pursuant to procedures approved by or under the direction of the Board.  Pursuant to those procedures, the Adviser considers, among other things: (1) the last sales price on the securities exchange, if any, on which a security is primarily traded; (2) the mean between the bid and asked prices; (3) price quotations from an approved pricing service; and (4) other factors as necessary to determine a fair value under certain circumstances.

68.      These statements in ¶ 67 were untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading because the daily NAV did not accurately reflect the true value of assets held by the Diversified Fund and defendants did not attempt in good faith to determine the fair value of swap contracts, but instead incorporated falsified data and manipulated pricing methodologies.

69.     The Prospectuses further represented as to the pricing of shares:

Shares of the Fund are sold at NAV per share which is calculated as of the close of regular trading (generally, 4:00 p.m., Eastern Time) on each day that the New York Stock Exchange ("NYSE") is open for unrestricted business. However, the Fund's NAV may be calculated earlier if trading on the NYSE is restricted or as permitted by the SEC. The NYSE is closed on weekends and most national holidays, including New Year's Day, Martin Luther King, Jr. Day, Washington's Birthday/Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. The NAV will not be calculated on days when the NYSE is closed for trading.

Purchase and redemption requests are priced based on the next NAV per share calculated after receipt of such requests and any applicable sales charge. The NAV is the value of the Fund's securities, cash and other assets, minus all expenses and liabilities (assets – liabilities = NAV). NAV per share is determined by dividing NAV by the number of shares outstanding (NAV/ # of shares = NAV per share). The NAV takes into account the expenses and fees of the Fund, including management and administration fees, which are accrued daily.

In calculating the NAV, portfolio securities are valued using current market values or official closing prices, if available. Each security owned by the Fund that is listed on a securities exchange is valued at its last sale price on that exchange on the date as of which assets are valued. Where the security is listed on more than one exchange, the Fund will use the price of the exchange that the Fund generally considers to be the principal exchange on which the security is traded.

***When market quotations are not readily available, a security or other asset is valued at its fair value as determined under procedures approved by the Board. These fair value procedures will also be used to price a security when corporate events, events in the securities market and/or world events cause the Adviser to believe that a security's last sale price may not reflect its actual market value. The intended effect of using fair value pricing procedures is to ensure that the Fund is accurately priced.*** The Board will regularly evaluate whether the Fund's fair valuation pricing procedures continue to be appropriate in light of the specific circumstances of the Fund and the quality of prices obtained through their application by the Trust's valuation committee. . . .

Fair value pricing may be applied to non-U.S. securities. The trading hours for most non-U.S. securities end prior to the close of the NYSE, the time that the Fund's NAV is calculated. The occurrence of certain events after the close of non-U.S. markets, but prior to the close of the NYSE (such as a significant surge or decline in the U.S. market) often will result in an adjustment to the trading prices of non-U.S. securities when non-U.S. markets open on the following business day. If such events occur, the Fund may value non-U.S. securities at fair value, taking into account such events, when it calculates its NAV. . . .

Other types of securities that the Fund may hold for which fair value pricing might be required include, but are not limited to: (a) investments which are not frequently traded and/or the market price of which the Adviser believes may be stale; (b) illiquid securities, including "restricted" securities and private placements for which there is no public market; (c) securities of an issuer that has entered into a restructuring; (d) securities whose trading has been halted or suspended; and (e) fixed income securities that have gone into default and for which there is not a current market value quotation.

70.     The description of the pricing procedures for Diversified Fund shares in ¶ 69 was an untrue statement of material fact and omitted to state other facts necessary to make the statement made not misleading because the purportedly fair value pricing procedures were not designed to ensure the Diversified Fund was accurately priced, nor did it accurately reflect how the NAV was being calculated. In fact, during the Relevant Period, Infinity Q's CIO, defendant Velissaris, had systematically mismarked the Diversified Fund's assets in order to artificially inflate the Diversified Fund's NAV.

71.     The Prospectuses each also misrepresented the role of the Valuation Committee and how securities held by the Trust were valued. For instance, the December 31, 2018 Prospectus stated in pertinent part as follows:

The Board has delegated day-to-day valuation issues to a Valuation Committee that is comprised of the Trust's President, Treasurer and Assistant Treasurer and is overseen by the Trustees.

> ***The function of the Valuation Committee is to review and oversee
> each Adviser's valuation of securities held by any series of the
> Trust for which current and reliable market quotations are not
> readily available. Such securities are valued at their respective
> fair values as determined in good faith by the Valuation
> Committee, and the actions of the Valuation Committee are
> subsequently reviewed and ratified by the Board.*** The Valuation
> Committee meets as needed. The Valuation Committee met twelve
> times during the fiscal year ended August 31, 2018, with respect to
> the Fund.

Each Prospectus goes on to disclose the number of times the Valuation Committee met during the fiscal year with respect to the Fund.

72.     The statements in ¶ 71 regarding the role of the Valuation Committee and how the securities held by the Trust were valued were untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading because the Valuation Committee was not taking the necessary steps to "review each Adviser's valuation of securities" and was not ensuring that the Diversified Fund's assets were properly valued. In fact, the Valuation Committee was either complicit in the systematic mismarking of the Diversified Fund's NAV or had completely abdicated its responsibilities, allowing the NAV of the Diversified Fund to be overstated by hundreds of millions of dollars.

73.     Similarly, the December 31, 2018 Prospectus stated the following concerning valuation risk:

> **Valuation Risk**. The sales price the Fund could receive for any
> particular portfolio investment may differ from the Fund's
> valuation of the investment, particularly for securities or other
> investments that trade in thin or volatile markets or that are valued
> using a fair value methodology. Investors who purchase or redeem
> Fund shares on days when the Fund is holding fair-valued
> securities may receive fewer or more shares or lower or higher
> redemption proceeds than they would have received if the Fund
> had not fair-valued securities or had used a different valuation
> methodology. Valuation may be more difficult in times of market
> turmoil since many investors and market makers may be reluctant

to purchase complex instruments or quote prices for them. The Fund's ability to value its investments may be impacted by technological issues and/or errors by pricing services or other third party service providers.

74.     The statements above in ¶ 73 were untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading because they failed to disclose any risk that the valuations could be based, in part, on third-party valuation models which were intentionally manipulated by Infinity Q. Specifically, the statements omitted that Infinity Q's CIO, defendant Velissaris, was intentionally manipulating the third-party pricing models used in valuing swaps and other Diversified Fund positions, resulting in a gross overstatement of the Diversified Fund's historical NAV.

75.     The Prospectuses and other offering materials were also misleading and incomplete with respect to the risk disclosures.  While the Prospectuses provided boilerplate risk disclosures, including a risks associated with "models and data" and "valuation risk," the materials failed to disclose any risk that the valuations could be based, in part, on third-party valuation models which were intentionally manipulated.

76.     The Prospectuses and other offering materials also contain false and misleading statements as to the oversight of the Diversified Fund and attempts to minimize risk, providing, in relevant part:

The Board has general oversight responsibility with respect to the operation of the Trust and the Fund. The Board has engaged the Adviser to manage the Fund and is responsible for overseeing the Adviser and other service providers to the Trust and the Fund in accordance with the provisions of the 1940 Act and other applicable laws. The Board has established an Audit Committee to assist the Board in performing it oversight responsibilities.

*     *     *

Through its direct oversight role, and indirectly through the Audit Committee, and officers of the Fund and service providers, the

22

Board performs a risk oversight function for the Fund. To effectively perform its risk oversight function, the Board, among other things, performs the following activities: receives and reviews reports related to the performance and operations of the Fund; reviews and approves, as applicable, the compliance policies and procedures of the Fund; approves the Fund's principal investment policies; adopts policies and procedures designed to deter market timing; meets with representatives of various service providers, including the Adviser, to review and discuss the activities of the Fund and to provide direction with respect thereto; and appoints a chief compliance officer of the Fund who oversees the implementation and testing of the Fund's compliance program and reports to the Board regarding compliance matters for the Fund and its service providers.

The Trust has an Audit Committee, which plays a significant role in the risk oversight of the Fund as it meets annually with the auditors of the Fund. The Board also meets quarterly with the Fund's chief compliance officer.

Not all risks that may affect the Fund can be identified nor can controls be developed to eliminate or mitigate their occurrence or effects. It may not be practical or cost effective to eliminate or mitigate certain risks, the processes and controls employed to address certain risks may be limited in their effectiveness, and some risks are simply beyond the reasonable control of . . .the Adviser or other service providers. Moreover, it is necessary to bear certain risks (such as investment-related risks) to achieve the Fund's goals. As a result of the foregoing and other factors, the Fund's ability to manage risk is subject to substantial limitations.

77.     The statements in ¶ 76 were untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading because the Board, the Adviser, and the Audit Committee were not, in fact, properly overseeing the operations of the Diversified Fund to minimize risk and instead were employing valuation methods which drastically increased risks to investors.

78.     The December 31, 2018 Prospectus stated that the Diversified Fund's NAV was $10.37 per investor class share as of August 31, 2017, with a total return of 7.56% for the year

ended August 31, 2017, and $10.42 per institutional class share as of August 31, 2017, with a total return of 7.88% for the year ended August 31, 2017.

79.     The December 31, 2019 Prospectus stated that the Diversified Fund's NAV was $11.54 per investor class share as of August 31, 2018, with a total return of 11.28% for the year ended August 31, 2018, and $11.62 per institutional class share as of August 31, 2018, with a total return of 11.52% for the year ended August 31, 2018.

80.     Given the admittedly manipulated and overstated valuations of the Diversified Fund, statements as to the Diversified Fund's assets, net assets, and NAV set forth in each of the Diversified Fund Annual Reports (each of which was audited by the Auditor and calculated, in substantial part, by Bancorp) contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading.

81.     The Notes to the Consolidated Financial Statements set forth in each of the Annual Reports also contain false and misleading statements.  The Notes provide that the statements have been prepared "in conformity with accounting principles generally accepted in the United States of America ("GAAP") for investment companies."  This representation was untrue because the financial statements for the Diversified Fund had not been prepared in accordance with GAAP but in fact were the product of pricing manipulation by Infinity Q designed to artificially inflate the Diversified Fund's NAV.

82.     With respect to "Securities Valuation," the Notes to the Consolidated Financial Statements for the year ended August 31, 2016 state that:

> The Fund follows a fair value hierarchy that distinguishes between market data obtained from independent sources (observable inputs) and the Fund's own market assumptions (unobservable inputs). The inputs or methodology used in determining the value of each Fund's investments are not necessarily an indication of the risk associated with investing in those securities.

Various inputs are used in determining the value of the Fund's investments. These inputs are summarized into three broad categories as defined below:

Level 1 - Quoted prices in active markets for identical securities. An active market for a security is a market in which transactions occur with sufficient frequency and volume to provide pricing information on an ongoing basis. A quoted price in an active market provides the most reliable evidence of fair value.

Level 2 - Observable inputs other than quoted prices included in level 1 that are observable for the asset or liability either directly or indirectly. These inputs may include quoted prices for the identical instrument on an inactive market, prices for similar instruments, interest rates, prepayment speeds, credit risk, yield curves, default rates, and similar data.

Level 3 - Significant unobservable inputs, including the Fund's own assumptions in determining fair value of investments

\*     \*     \*

Other financial derivative instruments, such as foreign currency contracts, options contracts, futures, or ***swap agreements***, derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. ***Depending on the product and the terms of the transaction, the value of the derivative contracts can be estimated by the Adviser or a pricing service using model pricing tailored to the type of security held. The pricing models use various inputs that are observed from actively quoted markets such as issuer details, indices, spreads, interest rates, curves, implied volatility and exchange rates.***

\*     \*     \*

The Fund makes dispersion investments using volatility and variance swaps. With the exception of dispersion trades, single stock volatility and variance swaps rarely trade. As a result, the Adviser deems these positions to be illiquid and classifies these positions as Level 3 in the fair value hierarchy. ***The Adviser uses model pricing to calculate the fair volatility level for each leg of the dispersion trade. The Adviser uses quotes from a pricing service and brokers to estimate implied volatility levels as an input to these models.*** A 1% change in the volatility spread could

change the value by up to 251%, which, depending on the direction of the change, could either increase or decrease the position's value.

The Fund makes cross-asset correlation investments using correlation and covariance swaps. ***The Adviser deems these positions to be illiquid and classifies these positions as Level 3 in the fair value hierarchy. The Adviser uses a third party calculation agent to value these positions. The local volatility model is used to calculate the fair correlation level for correlation swaps. Quotes from a pricing service are used to estimate the implied correlation levels as an input to these models.*** A 1% change in the implied correlation could change the value by up to 10%, which, depending on the direction of the change, could either increase or decrease the position's value.

The inputs or methodology used for valuing securities are not necessarily an indication of the risk associated with investing in those securities.

83.     The Notes to Consolidated Financial Statements for the following years contain substantially similar statements.

84.     These representations were untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading. Specifically, the Prospectuses and Diversified Fund Annual Reports failed to disclose that Infinity Q: (a) manipulated the pricing methodology for the Diversified Fund's assets; (b) failed to employ the valuation methodologies and internal controls policies and procedures represented to investors; and (c) materially overstated the Diversified Fund's NAV.

85.     In the Diversified Fund's 2019 and 2020 Annual reports and semi-annual reports, Infinity Q further represented that the mutual fund "uses a pricing service to model price the variance swap trades" and that the pricing service "uses quotes from brokers to estimate implied volatility levels as an input to these models."

86.     These statements were untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading. Specifically, the statements from the Diversified Fund's annual and semi-annual reports were misleading because they failed to disclose that Infinity Q: (a) manipulated the pricing methodology for the Diversified Fund's assets; (b) failed to employ the valuation methodologies and internal controls policies and procedures represented to investors; and (c) materially overstated the Diversified Fund's NAV.

87.     In addition, Oak Financial met and/or communicated quarterly with Velissaris and Lindell, amongst others, at which times they repeated the misrepresentations and misleading statements as to the valuation and risk of the Diversified Fund, including representations that the Diversified Fund was properly valued, and that the value of the shares was not volatile or subject to valuation swings.  Such representations concealed and misrepresented the misstated valuations of the swap contracts and the risks associated with such misstated valuations.

**Item 303 and Item 105 Violations**

88.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.F. § 229.303(b)(2)(ii) ("Item 303") requires defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Despite this, the Diversified Fund's Registration Statements and Prospectuses failed to warn investors that Infinity Q had manipulated the pricing methodologies used to value the assets of the Diversified Fund and that, as a result, the NAV of the Diversified Fund had been materially overstated during the Relevant Period. The failure to disclose these adverse facts violated Item 303 because these adverse facts would (and did) have an unfavorable impact on the Diversified Fund's net investment income from operations.

89.     Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105(a) ("Item 105"), requires, in the "Risk Factors" section of the Registration Statements, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure to warn of the risks posed by Infinity Q's manipulation of the Diversified Fund's pricing methodologies and material overstatement of the Diversified Fund's NAV violated Item 105 because these specific risks were not disclosed, even though they were some of the most significant facts that made an investment in Diversified Fund shares speculative or risky.

90.     Although the offering materials for the Diversified Fund included generic warnings regarding the possibility of future losses from trading, volatility, and derivatives that are applicable to investing in general, these representations were themselves materially misleading because they failed to disclose the specific risks and the magnitude of the risks that resulted from the manipulation of the Diversified Fund's pricing methodologies and the material overstatement of the Diversified Fund's NAV. Moreover, defendants' purported discussions of "risk" were misleadingly presented as future potential contingencies while failing to disclose adverse facts that had already occurred. For example, the Prospectuses stated that risks associated with the Diversified Fund's "Models and Data" and "valuation" could happen, but failed to disclose that the Diversified Fund's NAV had already been artificially inflated through manipulation of applicable pricing methodologies. Furthermore, the boilerplate warnings were insufficient to negate the misleading impression created by the misrepresentations in the Diversified Fund's Registration Statements and Prospectuses, as detailed herein, that the Diversified Fund had effective valuation procedures and policies that would preserve capital and achieve growth regardless of market conditions and, particularly, in down markets. The offering

materials for the Diversified Fund entirely omitted the specific risk that an investment manager could (and did) manipulate third-party valuation models that would lead to catastrophic losses in the Diversified Fund's assets. Moreover, defendants' purported "risk" discussions were themselves materially misleading because those discussions presented future potential adverse contingencies, while failing to disclose that Infinity Q's CIO had altered the pricing methodologies used to value the Diversified Fund's assets and that the Diversified Fund had already failed to perform the price verifications and other due diligence as represented to investors.

91.     The Offering Memoranda also misrepresented the role of the Valuation Committee, stating in pertinent part as follows:

> **Valuation Committee**
>
> Infinity Q has established a valuation committee (the "Valuation Committee") that is responsible for determining fair values and to ensure timely analysis and implementation of policies related to the pricing of individual securities or groups of securities that may be held by Infinity Q Funds.

## DEFENDANTS DISCLOSE THAT ITS VALUATION DATA WAS MANIPULATED

92.     On December 30, 2020, the Fund filed a supplemental Prospectus and notice with the SEC, which stated as follows:

> Effective as of the close of business on December 31, 2020, the Infinity Q Diversified Alpha Fund (the "Infinity Q Fund") is closed to all new investment, including through dividend reinvestment, and the Infinity Q Fund's transfer agent will not accept orders for purchases of shares of the Infinity Q Fund from either current Infinity Q Fund shareholders or new investors. Current shareholders, however, may continue to redeem Infinity Q Fund shares. If all shares of the Infinity Q Fund held in an existing account are redeemed, the shareholder's account will be closed.

93.     On or around February 22, 2021, Infinity Q filed a request with the SEC for an order pursuant to Section 22(e)(3) of the ICA suspending the right of redemption with respect to shares of the Fund, effective February 19, 2021, because of Infinity Q's inability to determine NAV. The request also stated that the Fund was liquidating its portfolio and distributing its assets to shareholders.

94.     As part of the "justification" for the request, the Fund admitted that Infinity Q's CIO, Velissaris, had been "adjusting certain parameters within the third-party pricing model that affected the valuation" of swap contracts.

95.     Infinity Q further admitted it was unable to conclude that these adjustments were reasonable, and, further, it was unable to verify that the values it had previously determined for the swap contracts were reflective of fair value.

96.     The filing went on to state that:

> Infinity Q also informed the Fund that it would not be able to calculate a fair value for any of the Swaps in sufficient time to calculate an accurate NAV for at least several days. Infinity Q and the Fund immediately began the effort to value these Swap positions accurately to enable the Fund to calculate an NAV, which effort includes the retention of an independent valuation expert. However, Infinity Q and the Fund currently believe that establishing and verifying those alternative methods may take several days or weeks. Infinity Q and the Fund are also determining whether the fair values calculated for positions other than the Swaps are reliable, and the extent of the impact on historical valuations. As a result, the Fund was unable to calculate an NAV on February 19, 2021, and it is uncertain when the Fund will be able to calculate an NAV that would enable it to satisfy requests for redemptions of Fund shares

97.     The Diversified Fund did not calculate an NAV on February 19, 2021, nor any day thereafter until the filing of this Complaint, and it is unknown when the Diversified Fund will be able to calculate an NAV.

98.     On February 22, 2021, due to Fund's inability to calculate its NAV, and on the Fund's request, the SEC suspended redemptions of the Fund indefinitely.

99.     As reported, beginning on March 1, 2021, the Board began working to liquidate all assets held by the Fund that were not already in cash or cash equivalents as of February 22, 2021.

100.    On March 26, 2021, the Fund reported that as of March 19, 2021, the Fund's portfolio has been entirely liquidated.  The Fund reported that the liquidation of the Fund's portfolio resulted in the Fund holding $1,249,485,022 in cash and cash equivalents as of March 25th, which is being held by the Fund's custodian. The Fund stated that this total does not include outstanding close-out payments from certain derivatives counterparties, but that such amounts are not expected to materially increase the Fund's cash holdings.

101.    The Fund further reported that:

> On February 18, 2021, the last day on which the Fund calculated a net asset value ("NAV"), the Fund's stated NAV was $1,727,194,948.50, compared to an asset value (before considering liabilities and other deductions necessary to calculate an NAV) as of March 25 of $1,249,485,022. As discussed below, the Fund is in the process of reevaluating its historical valuations of variance swaps and certain other holdings, which may lead to a reduction in the NAV for February 18 and earlier periods. Subject to that possible revaluation, the decrease in asset value assigned to the portfolio on February 18 to the March 25 asset value of $1,249,485,022 is currently attributable primarily to the value realized on liquidation of the Fund's bilateral OTC positions compared to their stated value on February 18. These positions included variance swaps, and other OTC swaps and options positions, that represented approximately 18% and 11%, respectively, of the Fund's NAV on February 18, 2021.

102.    On February 17, 2022, defendant Velissaris was indicted by the DOJ for securities fraud and obstruction of justice for orchestrating a scheme to lie to the Diversified Fund's and other Infinity Q Funds' investors and falsify documents. On the same day, both the SEC and the

CFTC also charged defendant Velissaris with fraud for overvaluing the Funds' assets by more than $1 billion while pocketing tens of millions of dollars in fees. The complaints allege in part that Velissaris accomplished his scheme by, among other methods: (i) surreptitiously inputting false information into the models; (ii) changing the models' standard underlying computation codes; and (iii) using improper pricing templates to guarantee the pricing service would return whatever artificial values he wanted rather than the values that the independent pricing service models would produce without Velissaris' nefarious actions. Using these fraudulent valuations, the complaints allege, Velissaris successfully caused Infinity Q to show hundreds of millions of dollars in false, exaggerated gains, creating a false record of success that Infinity Q in turn used to charge inflated fees, induce existing pool participants to commit additional monies, and lure in new participants.

103.    Infinity Q is currently holding investors' money hostage, withholding approximately $750 million from Diversified Fund investors. In the meantime, there is a substantial risk that defendants are continuing to deplete the assets of the Funds through legal defense costs, effectively treating investor assets as an enormous legal defense fund.

104.    Oak Financial and the Account Holders are now left waiting to learn what their investments in the Fund are actually worth and what they will receive at liquidation.

### COUNT I
**(Violation of §11 of the Securities Act Against the Trust, the Adviser,
the Individual Defendants, the Underwriter, the Administrator, and the Auditor)**

105.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

106.    For the purposes of this Count, Plaintiff expressly excludes and disclaims any allegations that could be construed as alleging fraud or intentional or reckless conduct, as this

Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a § 11 claim.

107.    As the issuer, the Trust is strictly liable under the Securities Act. Liability under this Count is also predicated on the Individual Defendants' signing of the Registration Statements, their positions as directors, and/or the filings incorporated by reference therein for the offerings, and all Securities Act defendants' respective participation in the offerings, which were conducted pursuant to the offering materials. The Underwriter served as the underwriter with respect to the offer and sale of the shares issued by the Diversified Fund. In addition, the Adviser, the Administrator, and the Auditor each consented to having been named as the persons who prepared or certified parts of the Registration Statements, which such portions are alleged herein to be materially false and misleading.

108.    The Registration Statements were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

109.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

110.    Plaintiff and its Account Holders acquired shares of the Diversified Fund pursuant to the Registration Statements. Plaintiff and its Account Holders sustained damages as a result of the violation, as the value of shares of the Diversified Fund has declined substantially subsequent to and due to defendants' violations.

111.    Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Count were bona fide offered to the public.

112.    As a result of the wrongful conduct alleged herein, Plaintiff suffered damages in an amount to be established at trial.

113.    By reason of the foregoing, the Trust, the Adviser, the Individual Defendants, the Underwriter, the Administrator, and the Auditor have violated §11 of the Securities Act and are each jointly and severally liable to Plaintiff for the substantial damages which were suffered in connection with their purchases of the Diversified Fund's securities on behalf of the account holders.

## **COUNT II**
### **(Violation of §12(a)(2) of the Securities Act Against the Trust, the Adviser, the Individual Defendants, and the Underwriter)**

114.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

115.    For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

116.    The defendants named herein were sellers and offerors and/or solicitors of purchasers of the shares of the Diversified Fund offered pursuant to the Prospectuses and other offering and marketing materials and communications.

117.    The Prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein. The actions of solicitation included participating in the preparation of the false and misleading Prospectuses and participating in marketing the shares of the Diversified Fund to investors, including Plaintiff.

118.    Each of the defendants named herein owed to the purchasers of Diversified Fund shares, including Plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses and corresponding supplements and amendments to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

119.    Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

120.    Plaintiff purchased shares of the Diversified Fund on behalf of the Account Holders pursuant to the defective Prospectuses. Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the falsehoods and omissions contained in the Prospectuses.

121.    By reason of the conduct alleged herein, each of the defendants named herein violated §12(a)(2) of the Securities Act.

122.    As a direct and proximate result of such violations, Plaintiff, which acquired shares pursuant to the offering materials, sustained substantial damages in connection with their acquisition of shares of the Diversified Fund.

123.    Accordingly, for the shares of the Diversified Fund held by Plaintiff and its Account Holders and issued pursuant to the offering materials, Plaintiff has the right to rescind

and recover the consideration paid for their shares, with interest thereon, and hereby tender their shares to Infinity Q. For shares of the Diversified Fund that they sold, Plaintiff seeks damages to the extent permitted by law.

### COUNT III
**(Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against The Fund, The Trust, The Adviser, The Individual Defendants, The Underwriter and The Auditor)**

124.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

125.    This Count is asserted against defendants the Fund, the Trust, the Adviser, the Individual Defendants, the Underwriter, and the Auditor, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

126.    During the relevant time period, the Fund, the Trust, the Adviser, the Individual Defendants, the Underwriter, and the Auditor, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above in the Prospectuses, Annual Reports, and other filings, marketing materials and communications, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

127.    The Fund, the Trust, the Adviser, the Individual Defendants, the Underwriter, and the Auditor violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of

business that operated as a fraud or deceit upon Oak Financial in connection with its purchases of the Fund's securities on behalf of the Account Holders.

128.    The Fund, the Trust, the Adviser, the Individual Defendants, the Underwriter, and the Auditor acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Trust were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public, including Oak Financial; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants, by virtue of their receipt of information reflecting the true facts of the Fund, their control over, and/or receipt and/or modification of the Trust's allegedly materially misleading statements, and/or their associations with the Fund which made them privy to confidential proprietary information concerning the Fund, participated in the fraudulent scheme alleged herein.

129.    Individual Defendants, who are the senior officers and/or directors, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Oak Financial and other investors, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel to members of the investing public, including Oak Financial.

130.    As a result of the foregoing, the market price of the Fund's securities was artificially inflated during the relevant time period that Oak Financial purchased shares on behalf of the Account Holders.  Oak Financial relied on the statements described above and/or the integrity of the market price of the Fund's securities during the relevant time period in

purchasing the Fund's securities on behalf of the Account Holders at prices that were artificially inflated as a result of the false and misleading statements of the Fund, the Trust, the Adviser, the Individual Defendants, the Underwriter, and the Auditor.

131.   Had Oak Financial been aware that the market price of the Fund's securities had been artificially and falsely inflated by the defendants' misleading statements and by the material adverse information which the defendants did not disclose and that the Fund was not going to follow the valuation procedures which it represented would be utilized, it would not have purchased the Fund's securities on behalf of the Account Holders at the artificially inflated prices that they did, or at all, and would not have retained such securities.

132.   As a result of the wrongful conduct alleged herein, Oak Financial and the Account Holders have suffered damages in an amount to be established at trial.

133.   By reason of the foregoing, the Fund, the Trust, the Adviser, the Individual Defendants, the Underwriter, and the Auditor have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Oak Financial for the substantial damages which were suffered in connection with its purchases of the Fund's securities on behalf of the Account Holders.

## <u>COUNT IV</u>
### (Violation of Section 20(a) of The Exchange Act Against The Adviser, The Individual Defendants, Bonderman and IQME)

134.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135.   During the relevant period, the Adviser managed and controlled the business affairs of the Fund and was a control person of the Fund.

136.    During the relevant period, the Individual Defendants participated in the operation and management of the Trust and Infinity Q, and conducted and participated, directly and indirectly, in the conduct of the Trust and Infinity Q's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Trust and Infinity Q's business practices.

137.    As officers and/or directors, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Fund's financial condition and results of operations, and to correct promptly any public statements issued by the Trust or Infinity Q which had become materially false or misleading.

138.    Infinity Q was an outgrowth of Bonderman's family wealth management office, Wildcat capital Management, and was established and ultimately overseen by Bonderman. Bonderman and IQME, by virtue of their ownership of over 25% of the Adviser, are each a control person of the Adviser.

139.    Because of their positions of control and authority, the Adviser, Individual Defendants, Bonderman and IQME were able to, and did, control the contents of the various reports, press releases and public filings which the Trust and Infinity Q disseminated in the marketplace.  The Adviser, Individual Defendants, Bonderman, and IQME exercised their power and authority to cause the Trust and Infinity Q to engage in the wrongful acts complained of herein.  The Adviser, Individual Defendants, Bonderman and IQME therefore, were "controlling persons" of the Trust and Infinity Q within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Fund's securities.

140.   Each of the Adviser, Individual Defendants, Bonderman and IQME, therefore, acted as a controlling person of the Trust and Infinity Q.  By reason of their senior management positions and/or being directors, and/or their ability to control the Trust and Infinity Q, each of the Adviser, Individual Defendants, Bonderman, and IQME had the power to direct the actions of, and exercised the same to cause, the Trust and Infinity Q to engage in the unlawful acts and conduct complained of herein.  Each of the Adviser, Individual Defendants, Bonderman, and IQME exercised control over the general operations of the Trust and Infinity Q and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains.

141.   By reason of the above conduct, the Adviser, Individual Defendants, Bonderman, and IQME are liable to Plaintiff pursuant to Section 20(a) of the Exchange Act, in an amount to be determined at trial.

### COUNT V
**(Violation of § 15 of the Securities Act Against the Adviser, the Individual Defendants, Bonderman, IQME, and the Administrator)**

142.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

143.    For the purpose of this Court, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §15 claim.

144.   The Adviser managed and controlled the business affairs of the Diversified Fund and was a control person of the Diversified Fund.

145.    Each of the Individual Defendants was a control person of the Diversified Fund, Trust, and/or Adviser by virtue of their positions as a Director, Trustee, and/or senior officer of the Diversified Fund, Trust, or Adviser.

146.    Bonderman and IQME also were control persons of the Adviser, with each owning more than 25% of the Adviser.

147.    The Administrator was a control person of the Underwriter.

148.    By reason of such conduct, the defendants named in this Count are liable as control persons pursuant to §15 of the Securities Act.

149.    Each of the defendants named herein was also a culpable participant in the violations of §§11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statements and/or having otherwise participated in the process which allowed the offer and sale of shares of the Diversified Fund to be successfully completed.

150.    By reason of such conduct, the defendants named in this Count are liable to Plaintiff who purchased the Diversified Fund during the Relevant Period pursuant to §15 of the Securities Act for the damages sustained by Plaintiff as a result of the violations of §§11 and 12(a)(2) of the Securities Act, in an amount to be determined at trial.

## EXCHANGE ACT COUNTS AND ADDITIONAL ALLEGATIONS

151.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

## ADDITIONAL ALLEGATIONS OF SCIENTER

152.    In support of the Exchange Act counts, the following facts support a compelling inference that the Trust, the Adviser, the Administrator, the Individual Defendants, the Auditor,

and the Funds acted with sufficient scienter at all relevant times. At the very least, these defendants knew about (or recklessly disregarded) the manipulation of NAV pricing and/or had access to additional facts rendering their public statements materially false or misleading.

**Defendants' Positions, Awareness and Direct Involvement in the Funds**

153.    The Trust was the issuer of the Diversified Fund and the filer of the Prospectuses, and actively controlled the day-to-day operations of the Diversified Fund. The Board was comprised of the officers of the Trust, many of whom signed the Prospectuses and all of whom exercised control over the Diversified Fund and the Diversified Fund's marketing efforts.

154.    Infinity Q was the Adviser to the Diversified Fund during the Relevant Period. Infinity Q retained the authority to make all investment decisions for the Diversified Fund, in exchange for a monthly management fee.

155.    Defendant Kashmerick was the Chairman of the Board, as well as the Trust's President and Principal Executive Officer during the Relevant Period. Defendants Chrystal, DiUlio, and Resis were trustees of the Board during the Relevant Period. All three signed the Prospectuses.

156.    Defendant Simon and Jensen were officers of the Trust during the Relevant Period. Defendant Simon also signed the Prospectuses.

157.    Defendant Velissaris was a Director of the Adviser during the Relevant Period, and until February 20, 2021, was its CIO. According to the government complaints, Velissaris also took various steps to conceal his fraud, including: (i) providing falsified swap term sheets to Infinity Q's auditors: (ii) surreptitiously making retroactive changes to Infinity Q's written valuation policy and (iii) creating phony minutes for meetings of Infinity Q's valuation committee that never happened.

158.    The SEC complaint alleged:

> By March 2020, when faced with market volatility caused by the
> COVID-19 pandemic, [defendant] Velissaris knew that the Funds
> were poorly positioned for increasing market turmoil and that they
> were at risk of failing. [To buy more time,] Velissaris sought a
> $100 million cash infusion from affiliates of Infinity Q's partial
> owner [which apparently is defendant Bonderman], but the
> proposed loan was never made. In response and to try to stave off
> the . . . Funds' failure, Velissaris stepped up his manipulation of
> the valuations of positions held by the . . . Funds, resulting in the
> overvaluation of each of the Funds' net assets by hundreds of
> millions of dollars. This overvaluation attracted hundreds of
> millions of dollars in additional investments and forestalled
> investor redemptions, all while some funds with similar investment
> strategies struggled or failed.

159.    Defendants Potter and Lindell were officers of the Adviser during the Relevant

Period. As trustees, directors, and/or executive officers of the Trust and/or Adviser, the

Individual Defendants participated in the solicitation and sale of fund shares to investors in the

Funds for their own benefit and the benefit of Infinity Q. Together, their positions, activities, and

direct involvement with the day-to-day operations with either or both Funds indicate that they

knew (or should have known) about the manipulation of NAV pricing and/or had access to

additional facts rendering their public statements materially false or misleading.

160.    Moreover, Defendants Velissaris, Potter, Chrystal, DiUlio, Resis, Kashmerick,

and Simon all signed the Registration Statements of the Diversified Fund. In so doing, they held

themselves out to the investing public as those persons most knowledgeable about the day-to-day

operations of the Diversified Fund, including the Fair Value Pricing model.

161.    Defendant Bancorp was the Administrator for the Volatility Fund, the transfer

agent for the Diversified Fund, and the parent company of Quasar during the Relevant Period.

U.S. Bancorp received fees, commissions, and/or profits from the Trust as part of its role as the

Administrator for the Volatility Fund. As Administrator, U.S. Bancorp was responsible for the computation of performance data, including NAV per share and yield.

162.    Bancorp provided its own senior employees to serve as the Diversified Fund's officers (including the Fund's Chief Compliance Officer) and assembled its own group of trustees to serve as the Diversified Fund's Board. The Board had direct statutory responsibility, under the ICA, for accurately calculating the value of the Diversified Fund's securities every trading day, and it contracted exclusively with U.S. Bancorp to fulfill that duty on a day-to-day basis under the Board's supervision. And because roughly two thirds of the Diversified Fund's portfolio consisted solely of cash, U.S. Bancorp's only valuation obligations related to the Diversified Fund's derivative securities, largely swap contracts, which accounted for the other third of the portfolio.

163.    In connection with its valuation duties (as well as its other responsibilities owed to the Diversified Fund), Bancorp agreed to be responsible for its own negligence and to indemnify the Diversified Fund for any losses incurred as a result. Under the Diversified Fund's Declaration of Trust, the members of the Board also assumed liability for their own actions, including their own gross negligence and breaches of the duty of care.

164.    The SEC complaint alleged:

> In April 2018, Velissaris edited a draft response for the CCO to send to representatives of the Administrator, who had inquired about Infinity Q's valuation process. The draft response, after Velissaris's edits, represented: "Infinity Q does not price any securities ourselves. Prices are either provided by [the Pricing Service] directly to [the Administrator] for non-vanilla OTC instruments or we forward [Pricing Service] values to [the Administrator] for positions not requiring [Pricing Service] valuation." This response was then sent by the CCO to representatives of the Administrator with Velissaris copied. Representatives of the Administrator replied to the CCO, with Velissaris copied, that the approach was acceptable to them as long

as Infinity Q was "complete and thorough in your summary." The Administrator further stated that "anything that is not downloaded directly from [the Pricing Service] is adviser priced even if you use models on [the Pricing Service] to complete the valuations. This is due to Infinity Q still having the ability to change inputs or calibrate any of the models."

165.   Bancorp as the Administrator was fully aware during the Relevant Period that Infinity Q had the "ability to change inputs or calibrate any of the models."

166.   Bancorp permitted Infinity Q and Velissaris to select and manipulate the pricing models utilized through a pricing service offered by Bloomberg Finance ("Bloomberg"), as well as the inputs relied upon by the models to estimate prices, despite Infinity Q's obvious financial incentive to inflate the Fund's prices to avoid reporting investment losses.

167.   While Bancorp repeatedly informed the Board throughout the Relevant Period that such valuations could be "easily" checked on Bloomberg, it did not independently verify the prices.

168.   Defendant EisnerAmper was the Diversified Funds' auditor during the Relevant Period. EisnerAmper audited and certified the Diversified Fund's consolidated statement of assets and liabilities, which was filed annually with the SEC in the Diversified Fund's Annual Report – stating that EisnerAmper assessed "the risks of material misstatement of the financial statements, whether due to error or fraud." Defendant EisnerAmper also audited and certified the consolidated financial statements of assets and liabilities concerning the Volatility Fund.

169.   According to the derivative complaint, EisnerAmper informed Infinity Q "in an August 2020 meeting that, as part of its annual audit review, EisnerAmper would 'utilize a third-party valuation specialist to assist in the review of the valuations of the Fund's Level 3 securities,' and that an area of 'emphasis' would be '[m]anagement's judgment in estimating valuation related to over-the-counter Level 3 derivatives.'"

170.    "However, , the methodology that EisnerAmper utilized for the testing, which was ultimately approved by the . . . Audit Committee, was fundamentally flawed for the same reasons that U.S. [Bancorp's] ongoing oversight was deficient and not identifying substantial pricing errors."

171.    The derivative complaint further alleged:

> EisnerAmper claimed to have "independently tested on a sample basis the model utilized in determining the valuation using inputs from the instruments term sheets and an implied volatility based on an independent broker-quote or recalculation using Bloomberg," as well as the control "whereby the [model] valuations from Bloomberg are independently downloaded by U.S. Bancorp Global Fund Services (Fund Administrator) and compared to the Investment Advisor's download."

172.    As alleged, "EisnerAmper mistakenly relied on the fraudulent B-Val models and inputs created by Infinity Q, and did not attempt to truly replicate or independently verify the valuations that Infinity Q had been reporting. Indeed, . . . attempting to match Velissaris's extensive modifications to the models and inputs would have immediately revealed the pricing misconduct."

173.    As a result, EisnerAmper's review revealed only $4.5 million in pricing discrepancies, despite that only a few months later the SEC would reveal that the swap portfolio was nearly worthless and the Diversified Fund's portfolio alone would be marked down by $500 million.

174.    EisnerAmper also arranged to have three sample swaps (of more than 150 contracts) independently tested by an outside valuation specialist. But the sample size was so small that, when Velissaris learned of the swaps that EisnerAmper planned to test, he was able to fraudulently modify the term sheets so as to change the factors affecting their value and prevent

detection. Although Infinity Q personnel had already uploaded the actual term sheets to an online portal accessible to EisnerAmper, Velissaris arranged to have them replaced by the altered term sheets.

175.     On information and belief, while EisnerAmper knew that the term sheets had been purportedly "updated" by Infinity Q without an explanation of what might have changed about the transactions, it made no effort to compare the two versions or otherwise determine why the original term sheets had been altered. The position that was tested and purportedly confirmed by EisnerAmper's valuation specialist was valued at over $22 million, but would soon prove to be worth less than $5 million. The derivative complaint alleged that "[b]ased on this wholly deficient review, EisnerAmper concluded that any pricing discrepancies within the Fund's portfolio were immaterial and that the risk of 'material misstatement of the valuation of derivatives [had] been reduced to an acceptable level.'"

176.     Together, Bancorp and EisnerAmper represented themselves to the investing public as neutral arbiters of the financial health of the Diversified Fund and other Infiniti Q Funds. In order to properly perform their respective roles, each was required to have access to, understand, and evaluate the financial positions of the Funds, including the NAV. In addition, each were compensated for their roles with the Diversified Fund and benefited financially from the services rendered and the artificially high NAVs that the Funds fraudulently reported.

177.     Defendants Bonderman and IQME each owned more than 25% of the Adviser and were control persons of the Adviser during the Relevant Period.

178.     According to a Diversified Fund Prospectus, the Adviser exercised significant control over the NAV via fair value pricing. "Fair value pricing is used when market quotations are not readily available, the Fund's pricing service does not provide a valuation (or provides a

valuation *that in the judgment of the Adviser does not represent the security's fair value)*, or when, *in the judgment of the Adviser, events have rendered the market value unreliable."* Not only did the Adviser, and its control persons, have significant opportunity to manipulate the valuation in accordance with their "judgment," the fair value pricing model required the Adviser, the Administrator, and the Individual Defendants to closely monitor the valuations being returned from the third-party pricing consultant. Each defendant named in this section either knew, or should have known, that the values being returned from the pricing service provider did not match those reported into the daily NAV, or that the variables being reported to the pricing service provider, critical to the underlying basis of the Adviser's "judgment," were incorrect.

**Magnitude of the Fraud**

179.    After reporting NAV of approximately $1.7 billion, the Diversified Funds held only $1.2 billion in cash following liquidation, confirming that the Diversified Fund NAV had been overstated by over $500 million. The enormous scope of the fraud indicates that each of the defendants named in this section must have been aware of (or recklessly disregarded) the NAV pricing manipulation scheme.

**Governmental Actions**

180.    On February 17, 2022, defendant Velissaris was indicted for securities fraud and obstruction of justice for orchestrating a scheme to deceive the Funds' investors and falsify documents. On the same day, both the SEC and the CFTC also charged defendant Velissaris with fraud for overvaluing the Funds' assets by more than $1 billion while pocketing tens of millions of dollars in fees.  The presence of multiple regulatory actions further bolsters scienter.

**Infinity Q's Own Admissions**

181.    In their February 22, 2021 letter to the SEC, Infinity Q stated that "it would not be able to calculate a fair value for any of the Swaps in sufficient time to calculate an accurate NAV for at least several days." Further, in an admission of the extent of the fraud, the letter stated "that establishing and verifying those alternative methods may take several days or weeks" and that "Infinity Q and the Fund are also determining whether the fair values calculated for positions other than the Swaps are reliable, and the extent of the impact on historical valuations." Infinity Q has subsequently disclosed in conversations with investors that the investigation extends back to at least 2018. The scheme to misstate the Funds' NAV was not a small or isolated action, but an extensive and pervasive one about which each of the defendants named in this section either knew or were reckless in not knowing.

**Oversight and Price Check Controls**

182.    According to a Diversified Fund Registration Statement, the Board provided reasonable oversight of the Diversified Fund's NAV calculation. The Valuation Committee of the Board was required to ensure that "[s]uch securities are valued at their respective fair values as determined in good faith by each Adviser, and the Valuation Committee gathers and reviews Fair Valuation Forms that are completed by an Adviser to support its determinations, and which are subsequently reviewed and ratified by the Board." Similarly, Infinity Q and the Administrator were tasked with reviewing and ensuring the accuracy of the Funds' NAV, which was purportedly audited by the Auditor. Defendants either failed to employ the valuation procedures, policies, and controls as represented to investors, or knowingly misrepresented the Funds' NAV.

**Motive and Opportunity**

183.    Defendants had the motive and opportunity to commit fraud. Many of the

defendants were compensated both in fixed retainer fees and based on the performance of the

Diversified Fund's NAV. Infinity Q, as the Adviser, was compensated by the Diversified Fund

with "an investment advisory fee computed daily and payable monthly, based on a rate equal to

1.70% of the Fund's average daily net assets." As an example, for the fiscal year completed

August 31, 2019, Infinity Q was paid over $8.3 million in advisory fees by the Diversified Fund.

184.    Infinity Q charged participants in the Diversified Fund a monthly management fee

equal to 12.5 basis points (or 1.5% on an annual basis) multiplied by the average daily value of

the participant's share of the mutual fund's net assets during the preceding month.

185.    As a consequence of the fee structures in the Funds, Infinity Q and the Individual

Defendants all were highly compensated, and such compensation increased with the Funds'

NAV; first, by the management fee measured by the average daily value, and second with the

performance fees associated with the profits of the Funds

186.    The independent trustees were also compensated at a retainer of $43,000 per year

and a fee of $1,000 per each meeting of the Board attended, as well as for expenses in connection

with Board meetings.

187.    Additionally, according to the SEC, Velissaris alone allegedly "collected more

than $26 million in profit distributions through his fraudulent conduct and without disclosing his

activities to investors."

**Additional Indicia of Scienter**

188.    Further indications that defendants, including the Auditor, either were or should

have been aware of the nature and extent of the fraud is evidenced by how obvious the

manipulation scheme was to uncover. As reported by The Wall Street Journal, one reported valuation was mathematically impossible, and in another instance, the disclosures show Infinity Q entered two nearly identical swap contracts referencing the same index over the same period, yet booked a gain on one that was more than three times as large as the other – an outcome analysts said defied logic. The nonsensical nature of the valuations further indicate that each of the defendants named in this section either knew, or should have known, about the Funds' fraudulently calculated NAV.

### NO SAFE HARBOR

189.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this complaint.

190.     First, none of the statements complained of herein was a forward-looking statement. Rather they were historical statements, or statements (or omissions) of purportedly current facts and conditions at the time the statements were made. Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

191.     To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Thus, Infinity Q's verbal and written "Safe Harbor" warnings accompanying its forward-looking statements issued during the Relevant Period were ineffective to shield those statements from liability.

192.   Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Infinity Q who knew that the forward-looking statement was false.

## APPLIABILITY OF THE PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

193.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

- the omissions and misrepresentations were material;

- the securities of the Funds were traded in an efficient market and were liquid and traded with moderate to heavy volume during the Relevant Period;

- the securities of the Funds were covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the securities of the Funds; and

- Plaintiff purchased, acquired, and/or sold the securities of the Funds between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

194.   Based upon the foregoing, Plaintiff is entitled to a presumption of reliance upon the integrity of the market.

195.   Additionally, Plaintiff is entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as defendants omitted material information in their Relevant Period statements in violation of a duty to disclose such information, as detailed above.

196.    Alternatively, Plaintiff can establish direct reliance because the misrepresentations were of fundamental importance to investors in the Funds and no reasonable investor would have invested in the Funds at the prices paid, or at all, if they had known the truth.  The misrepresentations involved the central aspects of the Funds' value, such as the Funds' NAV and valuation policies and procedures.

197.    These material misrepresentations were uniformly relied upon by all investors in making their respective investment decisions.

**LOSS CAUSATION/ECONOMIC LOSS**

198.    As a result of defendants' scheme, the Diversified Fund were overvalued throughout the Relevant period. Put simply, the Diversified Fund's valuation data was false and their NAVs—which directly impacted the purchase price of the Funds' securities—were artificially inflated. Accordingly, the Funds' shares were overvalued and were worth less than represented.

199.    The revelation of the facts and circumstances that defendants had misleadingly omitted exposed both defendants' scheme and the overvaluation from the public. The sharp decrease in value to both Funds were directly caused, in part, by revelation of defendants' valuation scheme. The revelation of defendants' scheme revealed that investors had paid more for the Funds' shares than they would have paid but for the scheme. Ultimately, the Funds were forced into liquidation. By November 8, 2021, the Diversified Fund completed the liquidation of its assets. Although the last reported NAV of the Diversified Fund was approximately $1.7 billion, the Diversified Fund only held $1.2 billion following liquidation, confirming that the NAV had been overstated by over $500 million.

## COUNT VI
### (Common Law Fraud Against All Defendants)

200.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201.    Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading statements specified above in the Prospectuses, Annual Reports, and other filings, marketing materials and communications to the Plaintiff and other investors.

202.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Trust were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public, including Oak Financial; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents.  These defendants, by virtue of their receipt of information reflecting the true facts of the Fund, their control over, and/or receipt and/or modification of the Trust's allegedly materially misleading statements, and/or their associations with the Fund which made them privy to confidential proprietary information concerning the Fund, participated in the fraudulent scheme alleged herein.

203.    Individual Defendants, who are the senior officers and/or directors, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Oak Financial and other investors, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel to members of the investing public, including Oak Financial.

204.    As a result of the foregoing, the market price of the Fund's securities was artificially inflated during the relevant time period that Oak Financial purchased shares on behalf of the Account Holders.  Oak Financial relied on the statements described above and/or the integrity of the market price of the Fund's securities during the relevant time period in purchasing the Fund's securities on behalf of the Account Holders at prices that were artificially inflated as a result of the false and misleading statements of the defendants.

205.    Had Oak Financial been aware that the market price of the Fund's securities had been artificially and falsely inflated by the defendants' misleading statements and by the material adverse information which the defendants did not disclose and that the Fund was not going to follow the valuation procedures which it represented would be utilized, it would not have purchased the Fund's securities on behalf of the Account Holders at the artificially inflated prices that they did, or at all, and would not have retained such securities.

206.    As a result of the fraudulent conduct alleged herein, Oak Financial and the Account Holders have suffered damages in an amount to be established at trial.

207.    By reason of the foregoing, the defendants are liable to Oak Financial for the substantial damages which were suffered in connection with its purchases of the Fund's securities on behalf of the Account Holders.

WHEREFORE, Plaintiff demands judgment against defendants as follows:

a)      Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b)      Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

c)      Awarding rescission or a rescissory measure of damages; and

d)      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and defenses so triable.

Dated: New York, New York
        August 26, 2022

**ROSENFELD & KAPLAN, LLP**


By:      _____
         Tab K. Rosenfeld (TR-9212)
         Steven M. Kaplan (SK-4228)
         1180 Avenue of the Americas, Suite 1920
         New York, NY 10036
         (212) 682-1400
         *Attorneys for Plaintiff Oak Financial Group, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 26, 2022, a true and correct copy of the

foregoing document was electronically filed with the Clerk of Court using the CM/ECF system,

which sends notifications of such filing to all counsel of record.

Steven M. Kaplan (SK-4228)